UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KARIM ABDELLA and PATRICIA ABDELLA,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>FOLSOM CORDOVA UNIFIED SCHOOL DISTRICT,<br><br>　　　　　　Defendant. | No. 2:14-cv-1259 KJM AC PS (TEMP)<br><br>FINDINGS AND RECOMMENDATIONS |

　　　　Plaintiffs Karim Abdella and Patricia Abdella are proceeding pro se in the above entitled action. The action has therefore been referred to the undersigned pursuant to Local Rule 302(c)(21) for all purposes encompassed by that rule.

　　　　On December 16, 2015, the matter came before the undersigned for hearing of plaintiffs' motion for summary judgment and defendant's cross-motion for summary judgment.[1] Plaintiffs Patricia Abdella and Karim Abdella appeared on their own behalf. Attorney Cynthia Smith appeared on behalf of the defendant.

　　　　Having reviewed the motions for summary judgment, the documents filed in support, the oppositions and replies, and the arguments made at the December 16, 2015 hearing, THE

---

[1] The parties agree that the case is to be decided on the basis of the administrative record, pursuant to the cross-motions.

1

COURT FINDS AS FOLLOWS:

## GENERAL FACTUAL BACKGROUND

Plaintiffs' child, M.A., has resided within the geographic boundaries of the Folsom Cordova Unified School District, ("District"), at all relevant times. M.A. first qualified for special education and related services in 2005, when M.A. began attending preschool, due to speech or language impairment ("SLI."). Administrative Record ("AR") at 2220. On March 5, 2010, the District, with plaintiffs' consent, developed an Individualized Education Plan, ("IEP"), for M.A., which was implemented on March 10, 2010.[2] Id. at 1619.

On May 13, 2011, plaintiffs and the District attended M.A's IEP team meeting. Id. at 1644. At the May 13, 2011 IEP meeting the District recommended that M.A. be exited from special education. Id. at 1656. Plaintiffs did not consent to the recommendation and the District continued operating under the March 5, 2010 IEP. Id. at 2824-26. Another IEP team meeting was held on September 23, 2011. Id. at 1665. Plaintiffs did not consent to the recommendations made at the September 23, 2011 IEP meeting and the District continued operating under the March 5, 2010 IEP. Id. at 3495. On April 27, 2012, another IEP team meeting was held. Id. at 3807. Plaintiffs consented to the April 27, 2012 IEP recommendations on July 23, 2012. Id. at 2096.

On April 3, 2013, plaintiffs filed a complaint for an Administrative Due Process Hearing with the Office of Administrative Hearings ("OAH"). Id. at 34. On May 9, 2013, the parties entered into an interim settlement agreement. Id. at 2127-28. On August 23, 2013, another IEP team meeting was held. Id. at 3857. Plaintiffs did not consent to the August 23, 2013 IEP recommendations. Id. at 3076, 3255. On September 6, 2013, the District filed a complaint for an Administrative Due Process Hearing with the OAH, which was consolidated with plaintiffs'

---

[2] "The IDEA defines an IEP as 'a written statement for each child with a disability,' setting forth the child's present levels of academic achievement and functional performance and measurable academic and functional goals." A.G. v. Paradise Valley Unified School Dist. No. 69, 815 F.3d 1195, 1203 (9th Cir. 2016) (quoting 20 U.S.C. § 1414(d)). The IEP "is prepared at a meeting between a qualified representative of the local educational agency, the child's teacher, the child's parents or guardian, and, where appropriate, the child . . . ." J.W. ex rel. J.E.W. v. Fresno Unified School Dist., 626 F.3d 431, 432 (9th Cir. 2010).

1  complaint filed April 3, 2013.  Id. at 343.  Hearings were held before an Administrative Law
2  Judge, ("ALJ"), on December 16-20, 2013, and January 7-8, 2014.  Id. at 2217.  On February 24,
3  2014, the ALJ issued a decision finding in favor of the District on all but one issue.  Id. at 2217-
4  69.
5        Plaintiffs filed this action on May 22, 2014.  ECF No. 1.  On September 25, 2015, the
6  parties filed their motions for summary judgment.  ECF Nos. 34 & 37.  On October 9, 2015, the
7  parties filed their respective oppositions.  ECF Nos. 41 & 45.  Replies were filed on October 16,
8  2015.  ECF Nos. 46 & 47.

## LEGAL STANDARDS

The goal of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, is "'to ensure that all children with disabilities have available to them a free appropriate public education [or 'FAPE'] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living.'"  A.G. v. Paradise Valley Unified School Dist. No. 69, 815 F.3d 1195, 1202 (9th Cir. 2016) (quoting Mark H. v. Lemahieu, 513 F.3d 922, 928 (9th Cir. 2008)).  "The IDEA provides for a cooperative process between parents and schools that culminates in the creation of an IEP for every disabled student."  M.M. v. Lafayette School Dist., 767 F.3d 842, 851 (9th Cir. 2014).  "The IEP must be reasonably calculated to provide the student with some educational benefit, although the IDEA does not require school districts to provide special education students with the best education available, or provide instruction services that maximize a student's abilities."  Covington v. Yuba City Unified School Dist., 780 F.Supp.2d 1014, 1020 (E.D. Cal. 2011) (citing Board of Educ. of Hendrick Hudson Central School Dist., Westchester County v. Rowley, 458 U.S. 176, 198-200 (1982)).

"In the event a student's parents believe that the district is not complying with the IDEA's procedural or substantive requirements, statutory safeguards entitle the parents to 'an impartial due process hearing' conducted either by the state or local educational agency."[3]  Cupertino

---

[3] In California, these due process hearings are conducted by the OAH, a state agency independent of the Department of Education.  See M.M. v. Lafayette Sch. Dist., 681 F.3d 1082,

3

Union School District v. K.A., 75 F.Supp.3d 1088, 1091 (N.D. Cal. 2014) (quoting Ojai Unified School Dist. V. Jackson, 4 F.3d 1467, 1469 (9th Cir. 1993)). "Any party aggrieved by the findings and decision" reached by a due process hearing decision "shall have the right to bring a civil action with respect to the complaint . . . in a district court of the United States."[4] 20 U.S.C. § 1415(i)(2).

After the commencement of such a civil action, the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." Id. "[C]omplete de novo review of the administrative proceeding is inappropriate." Van Duyn v. Baker Sch. Dist. 5J, 502 F.3d 811, 817 (9th Cir. 2007). "[T]he burden of persuasion rests with the party challenging the ALJ's decision." L.M. v. Capistrano Unified School Dist., 556 F.3d 900, 910 (9th Cir. 2009).

"Because Congress intended states to have the primary responsibility of formulating each individual child's education, this court must defer to their 'specialized knowledge and experience' by giving 'due weight' to the decisions of the states' administrative bodies.'" Hood v. Encinitas Union School Dist., 486 F.3d 1099, 1104 (9th Cir. 2007) (quoting Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist., 267 F.3d 877, 888 (9th Cir. 2001)). "'How much deference to give state

---

1085, 1092 (9th Cir. 2012); Everett H. ex rel. Havey v. Dry Creek Joint Elementary School Dist., 5 F.Supp.3d 1184, 1187 (E.D. Cal. 2014).

[4] Plaintiffs commenced this action purportedly on their own behalf as well as on behalf of their minor child, M.A., while proceeding pro se. ECF No. 1. However, the right to represent oneself pro se is personal to the plaintiff and does not extend to other parties. Simon v. Hartford Life, Inc., 546 F.3d 661, 664 (9th Cir. 2008); see also Russell v. United States, 308 F.2d 78, 79 (9th Cir. 1962) ("A litigant appearing in propria persona has no authority to represent anyone other than himself.") Thus, "a parent or guardian cannot bring an action on behalf of a minor child without retaining a lawyer." Johns v. County of San Diego, 114 F.3d 874, 877 (9th Cir. 1997). Nonetheless, the "IDEA includes provisions conveying rights to parents as well as to children." Winkelman ex rel. Winkelman v. Parma City School Dist., 550 U.S. 516, 529 (2007); see also Chambers ex rel. Chambers v. School Dist. Of Philadelphia Bd Of Educ., 587 F.3d 176, 183 (3rd Cir. 2009) ("Under Winkelman, therefore, parents undoubtedly have substantive rights under the IDEA that they may enforce by prosecuting claims brought under that statute on their own behalf."); Simon v. Hartford Life, Inc., 546 F.3d 661, 666 (9th Cir. 2008) ("Based on the statutory scheme, Winkelman held that parents have their own, enforceable right under the IDEA to the substantive adequacy of their child's education; therefore, parents may prosecute IDEA claims on their own behalf."). Accordingly, plaintiffs are proceeding only on their IDEA claims as parents. ECF No. 15 at 1.

educational agencies, however, is a matter for the discretion of the courts.'" J.W. ex rel. J.E.W. v. Fresno Unified School Dist., 626 F.3d 431, 438 (9th Cir. 2010) (quoting Gregory K. v. Longview Sch. Dist., 811 F.2d 1307, 1311 (9th Cir. 1987)). Nonetheless, the amount of deference given should increase when the administrative decision is "'thorough and careful[.]'"[5] Ashland School Dist. v. Parents of Student R.J., 588 F.3d 1004, 1008-09 (9th Cir. 2009) (quoting Seattle School Dist., No. 1 v. B.S., 82 F.3d 1493, 1499 (9th Cir. 1996)); see also Capistrano, 556 F.3d at 908 ("A district court shall accord more deference to administrative agency findings that it considers 'thorough and careful.'"). Moreover, courts "are not free 'to substitute [our] own notions of sound educational policy for those of the school authorities which [we] review.'" Amanda J., 267 F.3d at 887-88 (quoting Rowley, 458 U.S. at 206).

ANALYSIS

Plaintiffs' motion for summary judgment asserts the following five arguments.

**1)   Failure to Disclose Relevant Records**

Plaintiffs assert that the District violated their right to "meaningful participation" in the development of M.A.'s May 13, 2011, September 27, 2011, and April 27, 2012 IEP's by failing to provide plaintiffs with copies of all of M.A.'s testing results. ECF No. 37 at 10.[6] Specifically, plaintiffs argue that the defendants failed to provide plaintiffs with a copy of a "Conners 3-Teacher Assessment Report," ("Conners-3 Report"), administered by Bob Winford, M.A.'s teacher, on April 29, 2011. Id. According to plaintiffs, the Conners-3 Report, "showed the probability that M.A. had Attention Deficit Disorder-Inattention . . . ." Id. at 8.

As explained in the ALJ's February 24, 2014 decision:

> The Conners-3 rating scale for teachers sets forth 115 statements about a student's recent behavior, such as she "gets overly excited"

---

[5] The ALJ's February 24, 2014 decision in this case is a 54-page order that carefully, thoroughly and correctly details the relevant history, evidence and issues in dispute, with proper legal analysis supported by citations to case law and statutes. Accordingly, "[u]nder these circumstances," the undersigned finds that the ALJ's decision should be afforded "significant weight." Deer Valley Unified School Dist. v. L.P. ex rel. Schripsema, 942 F.Supp.2d 880, 882 (D. Ariz. 2013).

[6] Page number citations such as this one are to the page numbers reflected on the court's CM/ECF system and not to page numbers assigned by the parties.

5

> or "has a short attention span." A teacher is asked to respond to each statement by marking "not at all/never," "just a little true/occasionally," "pretty much true/often," or "very much true/frequently." The teacher's responses are then combined into 8 categories (such as inattention and aggression) and compared to the responses expected for students of the test subject's age and gender. The grouped responses are then ranked as low, average, high average, elevated, or very elevated. An "elevated" score means, according to the test publisher, "more concerns than are typically reported" and indicates that "problems ... may exist." A "very elevated" score means "many more concerns than are typically reported." Mr. Winford's responses produced both some elevated and very elevated scores.

AR at 2223.

The ALJ rejected plaintiffs' claim, finding that the Conners-3 Report completed by Mr. Winford was "professional work product provided for use by the clinician in interpreting his scores," and was not something "traditionally given to parents because, among other reasons, they are potentially misleading to people not professionally trained." Id. In this regard, the Conners-3 Report was simply part of the "underlying protocols [that] are not considered assessment results but are simply worksheets and raw data," that form the basis for a psychoeducational assessment. Id. at 2222-23. Specifically, the Conners-3 Report completed by Mr. Winford was part of a May 13, 2011 psychoeducational assessment conducted by Dr. Arthur Singer. Id. at 2222.

Moreover, the ALJ found that Dr. Singer's May 13, 2011 psychoeducational assessment "accurately summarized the information in the protocols, and did not omit anything significant." Id. at 2223. The ALJ further found that "Dr. Singer . . . attached to his report two pages of charts showing in graphic form the detailed scores for each rater, including those for Mr. Winford," and that plaintiffs did "not identify anything in the protocols that is not accurately summarized in Dr. Singer's final report." Id.

Plaintiffs' argument that they should have been provided a copy of Mr. Winford's Conners-3 Report is not entirely without support. One of the procedural safeguards established by the IDEA is the provision of "[a]n opportunity for the parents of a child with a disability to examine all records relating to such child . . . ." 20 U.S.C. § 1415(b)(1). The Ninth Circuit has held that "[e]xamination of records by parents is critical to the development of an IEP." Lafayette, 767 F.3d at 855; see also Amanda J., 267 F.3d at 891 ("Among the procedural rights

1 guaranteed to parents by the IDEA is the right to examine all relevant records with respect to the
2 identification, evaluation, and educational placement of the child, and the provision of a free
3 appropriate public education to such child."). The failure to provide such records to parents can,
4 under some circumstances, constitute a violation of the IDEA. See Lafayette, 767 F.3d at 853
5 ("District violated the IDEA by failing to . . . furnish the parents with the data"); Amanda J., 267
6 F.3d at 894 ("We hold that, by failing to disclose Amanda's full records to her parents once they
7 were requested . . . the District denied Amanda a FAPE").

8       Nonetheless, even assuming arguendo that the District violated the IDEA by failing to
9 provide plaintiffs with a copy of Mr. Winford's Conners-3 Report, "[n]ot every procedural
10 violation . . . is sufficient to support a finding that the child in question was denied a FAPE."
11 Amanda J., 267 F.3d at 892 (quotation omitted). Only "'procedural inadequacies that result in the
12 loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the
13 IEP formulation process, clearly result in the denial of FAPE.'" Doug C. v. Hawaii Dept. of
14 Educ., 720 F.3d 1038, 1043 (9th Cir. 2013) (quoting Shapiro ex rel. Shapiro v. Paradise Valley
15 Unified School Dist. No. 69, 317 F.3d 1072, 1079 (9th Cir. 2003)); see also Lafayette, 767 F.3d
16 at 856 ("because not all procedural violations deny a child a FAPE . . . we now consider whether
17 the violation resulted in the loss of educational opportunity, or seriously infringed the parents'
18 opportunity to participate in the IEP formulation process, or . . . caused a deprivation of
19 educational benefits").

20       Here, although plaintiffs were not provided with a copy of Mr. Winford's Conners 3-
21 Report, they were provided with a copy of Dr. Singer's assessment, which informed them that
22 Mr. Winford's Conners 3-Report "observed inattentive behavior without hyperactivity," that the
23 "inattention scale is considered very elevated, as is the learning problem scale," and that the
24 "Conners 3 ADHD score is also elevated." AR at 944. Dr. Signer's assessment also summarized
25 the Conners 3-Report completed by plaintiffs and stated that M.A.'s "Conners 3 ADHD score is
26 elevated for both parents, which is often indicative of a child diagnosed with attention deficit
27 disorder." Id.
28 /////

1    Moreover, Dr. Singer's assessment included a graphical reproduction of the "Content

2 Scales" found in Mr. Winford's Conners 3-Report. Id. at 983. That graph informed plaintiffs that

3 Mr. Winford's Conner's 3-Report for M.A. reflected an "inattention" score of 77. Id. at 948. The

4 assessment explained to plaintiffs that a score of 70+ corresponded to a "Very Elevated Score,"

5 the highest range of scores under the guidelines. Id. at 947.

6    Although plaintiffs argue that they were "not able to meaningfully . . . participate" in

7 M.A.'s IEP meetings, ECF No. 37 at 10, plaintiffs also acknowledge that they were

> … given charts showing the teachers results showing that M.A. had highly elevated levels of inattention, learning problems and peer relations, and parents results showing M.A. had elevated levels of inattention and learning problems, along with a summary by the District school psychologist that M.A's attention deficits were a 'mild concern.'

12 Id. at 11.

13    While plaintiffs disagree with the school psychologist's characterization of M.A.'s

14 potential attention deficit as being only a "mild concern," plaintiffs, and the IEP team, were

15 informed that the Conner 3-Report completed by Mr. Winford (like that completed by plaintiffs

16 themselves) indicated that inattention and ADHD were a concern for M.A. Plaintiffs have failed

17 to explain how the lack of a copy of Mr. Winford's Conners 3-Report caused the loss of an

18 educational opportunity, seriously infringed plaintiffs' opportunity to participate in the IEP

19 formulation process or caused the deprivation of educational benefits. Cf. Lafayette, 767 F.3d at

20 856 ("Without the RTI data, the parents were struggling to decipher his unique deficits, unaware

21 of the extent to which he was not meaningfully benefitting from the ISP, and thus unable to

22 properly advocate for changes to his IEP."); Amanda J., 267 F.3d at 894 ("The IEP team could

23 not create an IEP that addressed Amanda's special needs as an autistic child without knowing that

24 Amanda was autistic."). Here, the entire IEP team was informed that M.A. was at risk for

25 inattention and ADHD,

26    Accordingly, the undersigned recommends that plaintiffs' motion for summary judgment

27 be denied as to this claim.

28

### 2)     **2011-12 IEP**

Plaintiffs argue that M.A.'s March 5, 2010 IEP was in effect until April 27, 2012, in violation of the IDEA. ECF No. 37 at 11-12. Plaintiffs contend that after they and the District were unable to agree on an IEP on September 23, 2011, the District should have either continued working with plaintiffs to develop an agreeable IEP or the District should have filed an administrative complaint. Id. Instead, the District did neither and improperly continued implementing M.A.'s March 5, 2010 IEP. Id. The ALJ rejected plaintiffs' argument, finding that the District did not deny M.A. a FAPE during the 2011-12 school year. AR at 2261.

In support of their argument, plaintiffs cite Anchorage School Dist. v. M.P., 689 F.3d 1047 (9th Cir. 2012), in which the Ninth Circuit stated that when a school district and a child's parents are unable to agree to revisions on an outdated IEP, the district has "two options: (1) continue working with [the] parents in order to develop a mutually acceptable IEP, or (2) unilaterally revise the IEP and then file an administrative complaint to obtain approval of the proposed IEP." Id. at 1056.

Here, unlike in Anchorage, the record establishes that the District continued to work with plaintiffs in an attempt to develop a mutually acceptable IEP. M.A.'s IEP team met on May 13, 2011 for M.A.'s triennial IEP meeting. AR at 1656. At that meeting the District determined that M.A. was no longer eligible for special education. Id. Plaintiffs, however, disagreed and requested an Independent Educational Evaluation (IEE). Id. at 1054.

Thereafter, the parties agreed that M.A. would be evaluated by Catherine Cristo, an educational psychologist, at the request of the District, id. at 1895-1905, and by Jane Johnson, a speech-language pathologist, at the request of plaintiffs, id. at 1886-91. At the beginning of the 2011-12 academic year, the District continued to implement the March 5, 2010 IEP, which provided M.A. with thirty minute sessions of speech and language therapy 42 times a year in a small group setting, despite the District's belief that M.A. was no longer eligible for special education. Id. at 3802.

On September 23, 2011, the parties again gathered for an IEP meeting. Id. at 1665. After considering, among other evidence, the reports of Dr. Cristo and Jane Johnson, the District

9

1  proposed that M.A. receive 56 sessions of speech and language services, for thirty minutes each
2  session, in a small group setting.[7]  Id. at 1667.  The District also proposed a "syntax goal" to
3  "monitor" M.A.'s progress.  Id.  Plaintiffs, however, did not consent to the proposed IEP and the
4  District continued implementing the March 5, 2010 IEP.  Id. at 2873, 3008-09, 3495-96.

M.A.'s IEP team met again on April 27, 2012.  Id. at 91.  At that meeting, M.A.'s teacher reported that M.A. was "meeting grade level standards," was "nearer to the top" of her class "for math," that her reading was "at 120 wpm (up from 58 wpm in September, above 100 is expected)," her comprehension was "at 70% . . . . [h]er spelling at 90%, written expression was at 82%, and . . . . [p]roblem solving skills appear[ed] average for her age."  Id. at 3809.  M.A. received a mixture of As and Bs during her last trimester of the 2011-12 school year.  Id. at 2072.

As a result of the April 27, 2012 IEP meeting, the team developed an IEP that offered M.A. 56 sessions of speech and language services, for thirty minutes each session, in a small group setting.  Id. at 94.  Plaintiffs took the IEP home for review.  Id. at 513, 2693.  On July 23, 2012, after the end of the 2011-12 academic year, plaintiffs returned a signed copy of the April 27, 2012 IEP.  Id. at 514.

In sum, after the parties reached an impasse over the September 23, 2011 IEP, the District continued working with plaintiffs in order to develop an appropriate and mutually agreeable IEP. That is what the law requires.  The record does not establish that M.A. was denied a FAPE by virtue of the delay.  See K.M. ex rel. Bright v. Tustin Unified School Dist., 725 F.3d 1088, 1096 (9th Cir. 2013) ("for a child being educated in mainstream classrooms, an IEP is substantively valid so long as it is reasonably calculated to enable the child to achieve passing marks and advance from grade to grade"); Doug C., 720 F.3d at 1046 ("delays in meeting IEP deadlines do not deny a student a FAPE where they do not deprive a student of any educational benefit"); Sneitzer v. Iowa Department of Education, Case No. 4:13-cv-0150-REL-RAW, 2014 WL

---

[7] According to the ALJ's February 24, 2014 decision, the "District's offer in September 2011 to reinstate [M.A.'s] eligibility . . . was based on a questionable independent assessment by Ms. Johnson."  AR at 2264.  As discussed *infra*, in 2013 Ms. Johnson conducted another assessment, which "was not reliable because it contained serious errors in scoring."  Id.  Ms. Johnson "was unable or unwilling to produce the protocols for the 2011 assessment so that her scoring could be verified."  Id. at 2265.

10919515, at *14 (S.D. Iowa, Feb. 26, 2014) ("Neither the IDEA nor the applicable regulations prohibits an educational agency from carrying over all or a substantial portion of a student's IEP from year to year.  Rather, the statute requires only that the IEP be reviewed, and revised as appropriate to the student's educational needs."); cf Anchorage, 689 F.3d at 1052 ("after receiving the parents' response, the ASD unilaterally postponed any further efforts to develop an updated IEP until after a final decision had been rendered in the state court appeal").

Accordingly, the undersigned recommends that plaintiffs' motion for summary judgment be denied as to this claim.

### 3) **Failure to Evaluate**

The ALJ found that M.A. failed to "sustain her burden to establish that she remained eligible for special education after the . . . August 2013 IEP team meeting[.]"  AR at 2269.  Plaintiffs argue, however, that the District failed to evaluate M.A. prior to determining at the August 23, 2013 IEP team meeting that M.A. no longer needed special education services.  ECF No. 37 at 12.  Specifically, plaintiffs argue that 34 C.F.R. § 300.305(c) requires that before a student can be exited from special education classes, "the public agency must administer such assessments and other evaluation measures," but M.A.'s evaluations were conducted by a private neuropsychologist, Lisa Sporri, and two private speech language pathologists, Jane deGelleke and Jane Johnson.[8]  ECF No. 37 at 13.  Plaintiffs contend that the District is a public agency pursuant to 34 C.F.R. § 300.33 and therefore the District "did not procedurally adhere to the laws of IDEA" by allowing private individuals to conduct M.A.'s evaluations.  Id.

This argument is defeated by 34 C.F.R. § 300.502(c)(1), which provides that where a parent obtains an IEE at public expense, or shares the results of the IEE with the school district, the IEE "[m]ust be considered by the public agency . . . in any decision made with respect to the provision of FAPE to the child."  Here, the parties' May 9, 2013 interim settlement agreement provided that the District would reimburse plaintiffs for the evaluations of Sporri, deGelleke and Johson, explicitly identified those evaluations as "IEE"[s], and stated that the District would be

---

[8]  It appears plaintiffs have omitted page 14 of their motion for summary judgment, as the page numbered "13" is immediately followed by a page numbered "15."  ECF No. 37 at 13-14.

allowed to "review the IEEs." AR at 2127-28.

In their reply, plaintiffs assert that their argument is not "that only District assessments can be used in decisions to exit a student from special education," but that "the District did not assess M.A. prior to exiting her from special education on August 23, 2013 . . . period." ECF No. 47 at 9. This argument, however, is undermined by the fact that the three IEEs referenced above were all conducted in 2013 and considered at the August 23, 2013 IEP team meeting. AR at 3865.

On April 7, 2013, Jane Johnson, a speech-language pathologist, evaluated M.A. through a battery of tests, and recommended based on M.A.'s test results that M.A. receive two sixty-minute speech therapy session a week.[9] AR at 1926-36. It was later discovered, however, that Ms. Johnson had, through "honest human error," (id. at 2045), incorrectly scored M.A.'s test results. Correcting that error revealed M.A. did not meet the eligibility requirement for speech and language impairment. Id. at 3068.

On May 31, 2013, M.A. was evaluated by a second speech-language pathologist, Jane deGelleke. Id. at 2012. Ms. deGelleke's assessment included a review of Ms. Johnson's July 7, 2011 and April 7, 2013 IEEs of M.A. Id. Ms. deGelleke concluded that M.A.'s "receptive and expressive language skills are well within the normal limits for her chronological age," and that, while "she is having some difficulty using her above average language skills to access her critical thinking and problem solving skills," her scores did "not meet California Education Code, Section 56333 set forth under the category of SLI."[10] Id. at 2016.

On June 6 and June 7, 2013, M.A. was evaluated by Lisa Sporri, a pediatric neuropsychologist. Id. at 2017-29. Dr. Sporri's assessment included a review of M.A.'s previous "[n]umerous psychoeducational evaluations," (id. at 2020), as well as the administration of a

---

[9] As noted *supra*, Ms. Johnson had previously evaluated M.A. on July 7, 2011. AR at 1886.
[10] California Education Code § 56333 provides that a student "shall be assessed as having a language or speech disorder which makes him or her eligible for special education and related services when he or she demonstrates difficulty understanding or using spoken language to such an extent that it adversely affects his or her educational performance and cannot be corrected without special education and related services." The remainder of § 56333 then sets forth five instances in which a student is "eligible for special education and related services . . . ."

number of individual tests.  Id. at 2021.  Dr. Sporri concluded that M.A. had a full scale IQ that "falls in the average range" and that "[n]o underlying cognitive processes consistent with a learning disorder were evident on current testing.  Id. at 2026-27.  Dr. Sporri did, however, diagnose M.A. as suffering from "Attention-Deficit/Hyperactivity Disorder, Predominantly Inattentive Type," and recommended "education services under the eligibility of Section 504 . . . ."[11]  Id. at 2027-28.

The record does not support plaintiffs' contention that the District failed to assess M.A. prior to exiting her from special education on August 23, 2013.  Accordingly, the undersigned recommends that plaintiffs' motion for summary judgment be denied as to this claim.

### 4)     Failure to Obtain an IEP Team Decision

Plaintiffs make the confusing argument that M.A.'s IEP team did not decide that she was no longer eligible for special education at the August 23, 2013 IEP team meeting.  Plaintiffs assert that "[n]ot one person at the August 2013 IEP meeting made a proposal, determination or decision," and no decision was made until the District later emailed plaintiffs a recommended IEP.  ECF No. 37 at 14.

However, in their Closing Brief to the ALJ, plaintiffs argued that the District "predetermined that [M.A.] was not eligible for, and should be exited, from special education."[12]  AR at 805.  Moreover, plaintiffs' argument is contradicted by the transcripts of the August 23, 2013 IEP team meeting.  Those transcripts reveal that, after a lengthy and contentious meeting assessing M.A., it was clear to plaintiffs that "the answer" from the other team members was "no . . . she doesn't qualify for anything . . . ."  Id. at 1599.  On August 28, 2013, plaintiffs received a letter from the District discussing the August 23, 2013 IEP team meeting and proposing to "cease

---

[11]  "504 plans are developed through an evaluation process that focuses on providing reasonable accommodations to a student with a disability to allow the student to receive a comparable education to a non-disabled student."  K.D. ex rel. J.D. v. Starr, 55 F.Supp.3d 782, 785 (D. Md. 2014).  "[U]nlike FAPE under the IDEA, FAPE under § 504 is defined to require a comparison between the manner in which the needs of disabled and non-disabled children are met, and focuses on the 'design' of a child's educational program."  Mark H. v. Lemahieu, 513 F.3d 922, 933 (9th Cir. 2008) (quoting 34 C.F.R. § 104.33 (b)(1)).

[12]  The ALJ's February 24, 2014 decision found that the District did not predetermine the outcome of the August 23, 2013 IEP team meeting.  AR at 2245-46.

1  all special education services." Id. at 529.

2  Accordingly, the undersigned recommends that plaintiffs' motion for summary judgment

3  be denied as to this claim.

4  **5)    Failure to Place M.A. in the Least Restrictive Environment**

5  "The IDEA requires that school districts offer placements in the 'least restrictive

6  environment' available to meet a student's unique needs." Ravenswood City School Dist. v. J.S.,

7  870 F.Supp.2d 780, 789 (N.D. Cal. 2012) (citing 20 U.S.C. § 1412(a)(5)(A)). The IDEA's

8  requirement that student be placed in the least restrictive environment, ("LRE"), is sometimes

9  referred to as "mainstreaming." See Sacramento City Unified Sch. Dist. v. Rachel H., 14 F.3d

10 1398, 1404 (9th Cir. 1994) (adopting multi-factor test to determine appropriate level of

11 "mainstreaming"). Here, plaintiffs argue that the District violated the IDEA by failing to place

12 M.A. in the LRE possible, and seek as a remedy for that violation an award of compensatory

13 education. ECF No. 37 at 14, 16.

14 The undersigned finds that plaintiffs' are correct that the District violated the IDEA by

15 failing to place M.A. in the LRE. The parties stipulated in their May 9, 2013 interim settlement

16 agreement that M.A. would be placed in "English 10." AR at 2127. In English 10, M.A. "would

17 have mixed with some typically developing peers and received instruction from a general

18 education teacher." Id. at 2262. The District, however, placed M.A. in English 60, which

19 contained "no typically developing peers and [was] solely a special education class." Id. As the

20 ALJ found, "English 60 is not the class for which the parties contracted in the mediation

21 agreement" and the District had failed to place M.A. "in the LRE." Id.

22 However, the ALJ also found that "[n]o award of compensatory education" was

23 appropriate because M.A. could not "be retroactively mixed with her typically developing peers."

24 Id. at 2269. Instead, the ALJ ordered that M.A. be "promptly placed in a general education

25 language arts class so that she can interact with typically developing peers in the future." Id.

26 "[T]he IDEA offers compensatory education as a remedy for the harm a student suffers

27 while denied a FAPE." R.P. ex rel. C.P. v. Prescott Unified School Dist., 631 F.3d 1117, 1125

28 (9th Cir. 2011). The goal of compensatory education is to "place disabled children in the same

14

1    position they would have occupied but for the school district's violations of IDEA." Id. (quoting

2    Reid ex rel. Reid v. Dist. of Columbia, 401 F.3d 516, 518 (D.C. Cir. 2005)); see also G ex rel. RG

3    v. Fort Bragg Dependent Schools, 343 F.3d 295, 309 (4th Cir. 2003) ("Compensatory education

4    involves discretionary, prospective, injunctive relief crafted by a court to remedy what might be

5    termed an educational deficit created by an educational agency's failure over a given period of

6    time to provide a FAPE to a student."). Although "[i]t may be a rare case when compensatory

7    education is not appropriate," courts should "apply a fact-specific analysis" and may "decide that

8    a generalized award of compensatory education is not appropriate." Parents of Student W. v.

9    Puyallup School Dist., No. 3, 31 F.3d 1489, 1497 (9th Cir. 1994); see also Cousins v. Dist. of

10   Columbia, 880 F.Supp.2d 142, 145 n. 3 (D. D.C. 2012) ("Even if entitlement to an award is

11   shown through a denial of a free and appropriate public education, it may be conceivable that no

12   compensatory education is required for the denial of a FAPE either because it would not help or

13   because the student has flourished in his current placement.'").

14   Here, plaintiffs seek an award of "35 hours of individual tutoring by a non-public agency"

15   for the District's failure to place M.A. "in the least restrict environment for approximately six

16   months in her language arts class during the 2013/2014 school year." ECF No. 37 at 16.

17   Plaintiffs, however, fail to explain how an award of 35 hours of individual tutoring remedies

18   M.A.'s loss of time with "typically developing peers" or "instruction from a general education

19   teacher." AR at 2262. Moreover, it is not apparent to the undersigned that an award of

20   compensatory education could be formulated to remedy M.A.'s loss.[13] The undersigned concurs

21   with the ALJ's conclusion that no award of compensatory education is appropriate because M.A.

22   "cannot be retroactively mixed with her typical developing peers." AR at 2269.

23   Accordingly, the undersigned recommends that plaintiffs' motion for summary judgment

24   be denied as to this claim.

---

[13] In their reply, plaintiffs argue that M.A. was deprived of more than simply hours of general education instruction, in that her "fragile self-esteem" was also injured, "which no amount of compensatory education could ever make up for." ECF No. 47 at 10. The undersigned fully appreciates the emotional complexities faced by plaintiffs and M.A. and also agrees that it appears that no award of compensatory education can remedy the District's error.

CONCLUSION

The undersigned has found that plaintiffs should not be granted summary judgment in their favor with respect to any of their arguments.

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Plaintiffs' motion for summary judgment (ECF No. 37) be denied;
2. Defendant's cross-motion for summary judgment (ECF No. 34) be granted;
3. The decision of the ALJ be affirmed in all respects; and
4. This action be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: June 17, 2016

_____
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE